Thomas J. Nolan (SBN: 48413)

**Nolan, Armstrong & Barton, LLP**

600 University Ave. \ Palo Alto, Ca. 94301

Tel. (650) 326-2980  Fax (650) 326-9704

Attorney for Defendant
Kenneth Van Aalsburg

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 07-00603 (JW) |
| Plaintiff, | |
| v. | SENTENCING MEMORANDUM |
| KENNETH VAN AALSBURG, | Date:    September 22, 2008 |
| Defendant. | Time:    1:30 p.m. |
| | Court:   Hon. James Ware |

Defendant Kenneth Van Aalsburg, by and through his attorney, respectfully submits this sentencing memorandum to assist the Court with respect to his sentencing hearing now scheduled for September 22, 2008.  Mr. Van Aalsburg requests that the Court take into consideration this memorandum and its attached exhibits in determining a reasonable, just, and appropriate sentence in his case.

I.    Procedural History

Mr. Van Aalsburg is charged by information dated September 20, 2007, with a single count of possessing matters containing any visual depiction of a minor engaging in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(4)(B), as well as a criminal

1   forfeiture allegation pursuant to 18 U.S.C. § 2253(a)(1) and (a)(3) relating to the explicit

2   matters and the computers that contained them.  Mr. Van Aalsburg has been on

3   supervised release under the direction of Pretrial Services since his arraignment.

4          On April 28, 2008, Mr. Van Aalsburg pled open to the two charges in the

5   information.  A transcript of the plea hearing is attached and labeled Exhibit A.  The

6   following is an excerpt from that hearing:

7
8          Mr. Fazioli:   Your honor, if this matter was to proceed to trial, the government
           would be prepared to prove beyond a reasonable doubt, using documentary and
9          testimonial evidence, that on March 8th, 2005, Defendant knowingly possessed
           visual depictions of minors engaged in sexually explicit conduct.
10         ***

11         Mr. Fazioli:   Defendant knowingly possessed over 600 images of child
           pornography including images of prepubescent minors, and images portraying
12         sadistic or masochistic conduct.
           ***
13         The Court:   And Mr. Nolan, I wasn't clear, is Mr. Van Aalsburg admitting to the
           forfeiture count as well?
14
15         Mr. Nolan:   He is.

16         The Court:   Very well.

17         Mr. Nolan:   However, I'd like to indicate we are not admitting to the 600 images,
           but that's not necessary to constitute the offense under Count 1.
18
19         Mr. Fazioli:   I agree it's not necessary to prove the offense under Count 1.

20         The Court:   Very well.
                        I don't think I actually made a notice as to the number of images.
21
22         Mr. Nolan:   The prosecutor said in his proffer; it's not anywhere reflected in the
           information.
23
           Mr. Fazioli:   It's a proffer of what the government would be able to prove if the
24         matter went to trial.
                        So it's a sentencing issue, and I don't think the defendant needs to
25         admit to that in order to proceed with the guilty plea today.

26         The Court:   Very well.

27
28
                                                                                    2

And except with the respect to the number of images, Mr. Van Aalsburg, do you admit to the conduct described by the United States Attorney?

Defendant:   Yes, I do.

Exhibit A at 12-16.

Mr. Van Aalsburg has remained on supervised release without issue since that date.  The maximum penalty that Mr. Van Aalsburg faces as a result of his plea is ten years imprisonment, a $250,000 fine, and registration as a sex offender.  There is no mandatory minimum sentence in this case.

II.    Social History

Ken Van Aalsburg was born in Sheldon, Iowa on April 10, 1948. His father, Henry, and his mother, Anna Mae Van De Hoef, ran a one hundred sixty-eight acre diversified family farm.  Ken was the oldest of three siblings.  Joy, the middle child, was born on September 5, 1952, and Marlene, the youngest, was born on October 5, 1955.

When Ken was three years old, his family moved to a new farm in Boyden, Iowa. By the time Ken was seven years old, he had been given many responsibilities that contributed to the maintenance of the farm.  As the oldest child and the only boy in the family, Ken was expected to wake up at dawn to plow and disk the fields, go to school, and then continue his farm work in the late afternoon and evening.  In springtime, he devoted his time to fieldwork, and later in the season he had other farm chores to perform in the morning.  Ken enjoyed the farm work because the responsibility gave him a sense of purpose and accomplishment.  He especially enjoyed the fieldwork that involved using a tractor.  Ken's hardworking childhood in Iowa undoubtedly contributed to the strong work ethic and Spartan approach to life which have characterized his recent years.

3

1
2
3
4
5
6
7
8
9
10

Until the sixth grade, Ken attended a one-room country school, Sheridan #6, an experience that fostered in him tremendous abilities to focus and concentrate. Oftentimes there would be several lessons occurring at once – eighth grade geography on one end of the room and sixth grade English on the other.  Ken often was able to benefit from his exposure to advanced lessons while simultaneously absorbing the lessons specific to his grade level.  Beginning in his early years, he was an outstanding student, a fact that he attributes largely to the influence of his mother, who was valedictorian of her high school. Ken excelled particularly in math and science, eagerly responding to his teacher's inquiries on these subjects.

11
12
13
14
15
16
17
18
19
20

In sixth grade, Ken's family moved to another farmhouse in Boyden, Iowa.  Ken transferred to a new "town school", Boyden Community School.  He adapted quickly, making friends, and again excelling in math and science.  In middle school, Ken met Brad Ver Meer, who would become his best friend and confidante until the two young men graduated from high school.  Brad's family owned the farm adjacent to the Van Aalsburgs' farm; both boys were the eldest in their families and they had many chores in common.  They sometimes engaged in friendly competition to see who could complete a task, such as bailing hay, first.  Ken and Brad also attended Sunday school together and shared a passion for cars and hunting.

21
22
23
24
25
26
27
28

Ken describes his relationship with his younger sisters as what one would expect in rural Iowa in the early sixties. Ken was extremely protective of his two sisters. He loved them very much, but because they were much younger and the siblings were designated chores that coincided with traditional gender roles on the farm, they did not interact as

4

much as one might expect. Nevertheless, Marlene and Joy could always count on Ken to help them when they needed him.

Ken's relationship with his parents was loving but somewhat detached. He admired the fact that they were hard working; however, his parents' conservatism made it difficult for Ken to confide fully in them. Ken's father had barely finished the eighth grade, and, although his mother had performed exceptionally well in high school, she chose not to pursue a higher education.  Henry and Anna Mae Van Aalsburg derived their outlook on the world almost entirely from the religious teachings they had received growing up. Ken found that there was no room for discussion with his parents on many issues because they felt that he had to believe verbatim what was written in the Bible or he would go to hell.  Ken especially felt the pressure of his parents' religious exigencies because they were prominent members of an exceptionally strict Presbyterian congregation.  Henry Van Aalsburg was an elder in the Reformed Church of America, a Protestant Church of Dutch decent.  As a young child, Ken remembers being constantly fearful of divine punishment, thinking the world was going to end every time he had a migraine headache or enjoyed a beautiful sunset.

As a young adult, Ken was exceptionally curious, and could not help but question the world around him, a characteristic that was in direct conflict with his parents' world view.  Ken loved science and could not reconcile the scientific notions of fact, observation, and objectivism with what he considered to be his parents' blind faith. As Ken matured, he experienced a vast divide between his passion for science and his parents' strict adherence to religious dogma.  As a result, Ken felt that he could not discuss his true thoughts and feelings with his parents.  Unfortunately, the disconnect

5

Ken felt between his belief system and that of his parents led to an estrangement that continued through Ken's adult life.

In 1962, Ken began attending Boyden Hall Community High School.  He adapted quickly and focused on his studies and farm work.  When Ken turned sixteen he was able to obtain his drivers license, at which point his social life began to bloom. That year, he met DeAnne Oldenkamp, his future wife whose cousin attended Ken's Sunday school. Ken's driver's license allowed the couple to go out on dates and sometimes double dates with Brad Ver Meer and his girlfriend.  In 1966, at the end of their senior year and after the couple had been going steady for two years, Deanne discovered that she was pregnant.  Ken had intended to enlist in the Air Force because he wanted to explore the world beyond small-town Iowa and then go to college with the assistance of the GI bill. Upon learning of the pregnancy he understood, however, that he had a responsibility to provide for DeAnne. The couple married when they graduated high school.

In June 1966, Ken graduated third in his class of fifty-four students. With his wife's due date only months away, Ken needed to revise his plan such that he could both provide for his family and pursue an education.  He decided to attend DeVry University in Chicago in order to obtain an Associate Degree in Applied Science with a focus in Electronic Technology.  Soon after Ken began school, Ken Jr. was born on September 4, 1966.  The young family settled in an apartment in Chicago, and Ken began working part time at Hewlett Packard (HP) as a Microwave Instrumentation Technician.   In 1969, the company began to move away from manufacturing instrument controllers and transitioned into the computer business.  As a result, Ken began to work as a Customer

Service Engineer, and would regularly attend training sessions on new technologies in California for a month at a time throughout the year.

In 1971, when DeVry first began offering bachelor's degrees, Ken decided to pursue a degree in Science, Engineering, and Technology. That year, he purchased a home in Weeling, Illinois, a suburb of Chicago, so that his family would be more comfortable. Unfortunately, Ken's frequent business trips to California damaged his relationship with DeAnne. Ken would travel to California for five days at a time during the week, benefiting from his HP expense account and leading a life that was cosmopolitan, exciting, and stimulating, at least from the point of view of a couple that was raised in rural Iowa. When he came home, he was exhausted from traveling. DeAnne, who had been cooped up at home all week, grew frustrated. Ken loved the excitement and progressivism of California and wanted to move there. DeAnne thought that the state was filled with "weirdoes" and hippies, and she refused to leave Chicago. From Ken's perspective, DeAnne was interested only in leading a small town life, while he wanted to explore the world.

After eight years of marriage, the couple divorced in 1976. DeAnne moved back to Sheldon with Ken Jr. Ken visited his son frequently and provided child support. Their divorce was amicable, although the couple eventually became estranged, and lost contact completely approximately fifteen years ago. After the divorce, Ken moved to Silicon Valley in order to be near HP headquarters. He bought a home in Santa Clara, where he still lives today. That year he also joined the Big Brothers and Big Sisters program of Santa Clara County, motivated in part by the guilt he felt for leaving his son. Ken mentored a twelve year old, Alton Davis, for one year and enjoyed the experience

7

immensely. That same year, he met Karen Lund, a woman seven years his senior whom he dated for about a year.  Ken recalls that the relationship was caring, but mainly a rebound from his divorce.  Ken ended the relationship when Karen's chemical dependency problems became apparent.

Moving to Silicon Valley was the beginning of the end of Ken's engineering career. He developed great admiration for software developers and became interested in the hardware aspect of software development, computer languages, and data communications. Ken began working on software application development projects, but after a short while, the novelty of these projects wore off.  Eventually, Ken found that the level of detail in software development was too tedious, and he transitioned to technical writing, which he found no less tedious.

In 1980, a few of Ken's co-workers encouraged him to join their cycling adventures, although Ken's cigarette addiction initially prevented him from fully engaging in the sport.  Ken had been addicted to cigarettes for years, and had been trying to quit since 1975.  He had made several attempts, briefly quitting and then invariably succumbing to nicotine cravings a few days later. When Ken took up cycling, he made a concerted effort to quit. On January 31, 1980, Ken smoked his last cigarette.

Between 1980 and 1985 Ken continued working at HP.  During that period, he found his technical writing work dreary and monotonous. He continued working mostly to support his cycling habit.  He, along with his coworkers and a biking mentor, Bruce Templeton, would take long trips during the summer. The most memorable of these trips were the "Super Tours" he took with fifty other cyclists every year between 1981 and 1985.  The group would go to exotic locations, and bike one hundred to one hundred

8

twenty-five miles a day. They would camp out in the evenings, or sleep on the bus in which they all traveled.  One year the group biked across Western Europe. They rode the Alps and followed the Tour de France route. During this time cycling became an integral part of Ken's life.  In 1984, when a friend asked to borrow Ken's car, he stopped driving altogether.  Since then, Ken has not owned a car, choosing instead to bike everywhere he goes.  At the time, cycling was more exhilarating than anything that Ken had experienced, and he found that it afforded him a tremendous feeling of self-sufficiency and wellbeing.  Ken's cycling devotion and accomplishments are particularly impressive given that, since his late twenties, he has suffered from an intermittent irregular heartbeat condition called paroxysmal atrial fibrillation.  For years Ken took digitalis and refused to let his heart condition stop him from pursuing his passion.

In 1985 Ken took a leave of absence from HP that would eventually become permanent.  He had become interested in exercise physiology, and wanted to explore options in that field. He aspired to attend Palmer Chiropractic College, and went to West Valley Community College in order to fulfill the biology and chemistry prerequisites. During his three years at West Valley, Ken maintained an almost perfect grade point average, while working as a tutor in biology, physiology, and anatomy. There, Ken met and began a relationship with Donna Van Koel.  The couple moved in together, and Ken hoped their relationship could turn into something permanent.  Unfortunately, the couple broke up after two years together.

In 1988 Ken entered Palmer, but soon found that his enthusiasm for exercise did not translate into an interest in chiropractics.  After a year at Palmer, he decided to leave and pursue a degree in exercise physiology at San Jose State. While there, he was a

9

teaching assistant for weight training and badminton classes and maintained a 3.6 GPA. Although he did not complete his thesis and therefore did not receive his master's degree, he did complete all the required coursework and was later able to apply the knowledge he had acquired to his business endeavors.

When Ken completed his coursework in 1992, he volunteered at the Stanford Center for Disease Prevention, conducting exercise tests on senior citizens. He also worked as a physical therapy aid at Santa Clara Physical Therapy.  That year, he began to date Julie Allison, whom he knew from West Valley Community College.  Julie was divorced with three kids.  Like Ken, Julie was athletic, and they both worked at physical therapy clinics.   The couple would often ride their tandem bike, and during the winter they would go cross-country skiing.   Ken, however, did not want to get married and, after two and one-half years, the couple parted on good terms and maintained a friendship for several years after their romantic relationship ended.

Beginning in 1993 and ending in 2000, Ken worked at Mission College teaching a training program for firefighters as well as weight training classes. He simultaneously worked as an aid in Santa Clara Physical Therapy.  In 1995, his team at Santa Clara Physical Therapy was laid off due to cutbacks. This was a defining moment for Ken, who up to that point had yet fully to experience financial pressure.  He had been a student for many years and had exhausted his savings from his years at HP.   At this point, Ken vowed to make work his main priority in life.  Fortunately, Ken worked as a trainer at Gold's Gym, and eight months later was promoted to fitness director. While at Gold's, he met Trisha Kuver, a student in his spinning class who worked in sales for a commercial airline. For approximately a year and a half in 1999 and 2000, they spent most of their

10

1   time together. Although the companionship was pleasant, the couple found that they had

2   little in common, and eventually broke up.

3        Ken's relationship with Trisha was his last serious relationship.  From that point

4   forward, Ken has not actively searched for a significant other, preferring instead to devote

5   himself primarily to his work, which involves constant interactions with a wide variety of

6   interesting people.  Indeed, since 2000, Ken's life has been full of transition and growth

7   with regards to his career in fitness.  Ken began teaching pilates part time at Fitness

8   Concepts in Los Altos while continuing to work at Gold's Gym.  In 2004, he left Gold's

9   Gym and began to teach full time at Fitness Concepts.  In 2005, Ken took out a loan and

10  purchased Fitness Concepts.  He looked forward to working for himself and running his

11  own business, which expected to be an activity that he could continue for many years.

12  He is proud of his business and the positive environment that it provides for his

13  employees and clients.

14        When Ken began to devote himself entirely to work, he had very little time to relax

15  or socialize.  In 2000, Ken hooked up his computer to the Internet and, for the first time,

16  began using the Internet in order to communicate with other people.  He would get home,

17  exhausted from work, logon to American Online, and occasionally participate in chat

18  rooms.  At first, Ken participated out of curiosity.  He would chat with all kinds of people,

19  including people who wanted to view nudity.  At the time, there was a function that

20  allowed Ken to type in "list me," which would add him to an e-mail list.  It was then that he

21  began to receive e-mails that contained pornography, some of which included younger

22  looking girls.  Up to that point in his life, Ken had had a steady, active, and healthy social

23  life. He had viewed legal, adult pornography, but the practice had been private, casual

and infrequent.  This exploration of the Internet led to the conduct that forms the basis of this case.

Ken is a self-proclaimed workaholic. Currently, he has a rigorous work schedule, often teaching twelve hours a day, scheduling his first appointment as early as 7:30 a.m. and his last appointment at 8:15 p.m.  He frequently stays in the office overnight in order to avoid the round trip bike ride to his home.  Ken attributes his apathy regarding romantic relationships to his "intense" work ethic; his work responsibilities and relationships are all-consuming for him.  Ken even has clients scheduled for Christmas Eve and Christmas Day.  He is aware that his devotion to his work has made him lose focus on other important aspects of his life.  He no longer enjoys any structured free time, and often feels sleep-deprived.  Cycling, which at one time had been his main social activity, is now merely a method of transportation. Ken feels that the relationships he has at work his work are a satisfactory social outlet.

Ken's relationship with his son also suffered when his workload intensified beginning in 2000 and 2001.  Although Ken made efforts to visit Ken Jr. when he was younger, their relationship dwindled as the years passed, and they currently have little contact.  Now Ken Jr. lives in Iowa with his second wife Paula, and their two children. When his first granddaughter, Ashley, was born in 1995, Ken began to visit the family regularly. Unfortunately, the frequency of his visits decreased when he became immersed in work and school.  Ken went to meet his second granddaughter, Kelsey, in 2001, within a few months of her birth.  Ken has not seen his son and his family since that visit.  In 2005, Ken went back to Iowa to visit his parents, and attempted to coordinate a visit with his son. It was obvious to Ken that Ken Jr. did not want to see him.

To this day, Ken's estrangement from his son is the part of his life that saddens him the most, and he feels great remorse that he did not do more to prevent it from occurring.

Ken maintains close contact with his sisters, Joy and Marlene, especially Joy, whom he would visit often when she lived in San Diego.  Until recently, he spoke to Joy and Marlene at least once a month.  Since their mother died in 2007, their communication has increased.  Ken's mother's death has made him appreciate the importance of family, and Ken strives to be closer to his father, who is 89 years old, lives in Sibley, Iowa and has failing health.  This appreciation has also deepened his sadness over the loss of a relationship with his son, and Ken desires one day to make efforts to rekindle it.

III.     Sentencing Guidelines Discussion

The United States Sentencing Commission was charged by Congress with the task of establishing guidelines that would carry out the basic sentencing objectives contained in 18 U.S.C. § 3553(a).  *See United States v. Rita*, 127 S.Ct. 2456, 2463 (2007).  Those objectives include, *inter alia*, "certainty and fairness," avoiding unwarranted sentencing disparities, and permitting "individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices."  *Ibid.*   The primary tool used by the Commission in creating the Sentencing Guidelines, the product of its Congressional mandate, was extensive and thorough examination of empirical data that included "tens of thousands of sentences."  *Id.* at 2464; *see also United States v. Gall*, 128 S.Ct. 586, 594 (2007) (acknowledging that the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

An extensive and thorough evaluation of empirical data is *not*, however, how the Sentencing Commission has been forced to set the Guidelines for charges of possession of child pornography.  *See generally* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (July 3, 2008), http://mow.fd.org/online_docs.shtm.  The following is a brief history of the Guidelines as they relate to child pornography, which is described in far greater detail in Mr. Stabenow's article.

In 1990, Congress for the first time criminalized the possession of child pornography, and thereafter the Commission proposed to set a base offense level of 10 pursuant to § 2G2.4 for possessing, receiving, and transporting such material.  The base offense level for trafficking in child pornography had been set several years earlier at 13 pursuant to § 2G2.2.  *Id.* at 4-5.  Shortly thereafter, Senator Helms of North Carolina, under intense pressure from religious groups, proposed an amendment to the Treasury-Postal Service Appropriations Bill of 1991 that directed the Sentencing Commission (1) to expand greatly the category of crimes that fell under § 2G2.2 to include not only trafficking, but also receiving and transporting child pornography (which the Commission had deemed analogous to possession rather than trafficking); (2) to increase the base offense level under § 2G2.2 from 13 to 15; and (3) to increase the base offense level for § 2G2.4, which would cover only simple possession under the new law, from 10 to 13.  *Id.* at 6-9.  The amendment passed along with the unrelated legislation to which it was attached.

In 1995, Congress again directed the Sentencing Commission to modify the Guidelines as they related to child pornography; this time, it mandated an increase of the

14

base offense level under § 2G2.2 from 15 to 17, with a new 2-level increase for the use of a computer, and increased the base offense level under § 2G2.4 from 13 to 15 with the same computer-related increase. In response to the new increases, the Commission commented that there was little to no distinction between simple possession cases and simple receipt cases, because material that is possessed must at some point be received, and it expressed concern that the crimes were treated separately under the Guidelines under §§ 2G2.2 and 2G2.4. *Id.* at 15-16.

In 2003, Congress, without receiving comment from the Sentencing Commission, passed the PROTECT Act, which (1) added to the Guidelines large offense-level increases related to the number of images of child pornography, and (2) set mandatory minimum prison sentences. *Id.* at 18-20. In 2004, in response to the PROTECT Act, the Commission merged § 2G2.4 into § 2G2.2, and, *inter alia*, increased the base offense level of the now-expanded § 2G2.2 from 17 to 18. It did so not on the basis of empirical study or analysis, but, rather, in order to ensure that the Guidelines ranges corresponded to and exceeded the new mandatory minimums set by Congress. *Id.* at 19-21. These provisions remain in substance today. In essence, with respect to child pornography cases such as this, Congress had completely relieved the Sentencing Commission of its authority and mandate to set fair and just sentences based upon careful study and research.

A similar abrogation of the Commission's authority and mandate was addressed by the Supreme Court in *Kimbrough v. United States*, 128 S.Ct. 558 (2007). At issue in *Kimbrough* was the Guidelines' disparate treatment of crack- and powder-cocaine convictions, which the Court noted was derived by the Commission not through the

15

preferred method of empirical analysis but, rather, as a result of Congressional direction. *Id.* at 567. Kimbrough pled guilty to several charges relating to the distribution of crack cocaine, and his Guidelines range was 228 to 270 months, with a statutory minimum prison term of 15 years. *Id.* at 559-560. The district court sentenced Mr. Kimbrough to the statutory minimum largely on the basis of its disagreement with the Guidelines' treatment of crack cocaine, and its finding that, under § 3553(a), any greater sentence would not accomplish the statute's goals. With respect to the latter finding, the court noted that Mr. Kimbrough had no criminal history and had a long record of steady employment. With respect to the former, the district court rejected the Sentencing Guidelines on the following basis:

> Congress established the Commission to formulate and constantly refine national sentencing standards. Carrying out its charge, the Commission fills an important institutional role: It has the capacity courts lack to base its determination on empirical data and national experience, guided by a professional staff with appropriate experience. . . The crack cocaine Guidelines, however, present no occasion for elaborative discussion on this matter because those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role. In formulating Guidelines ranges for crack cocaine offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of empirical data and national experience.

*Id.* at 574-75 (internal citations and quotations omitted). The Supreme Court upheld the trial court's sentencing decision and the bases therefor.

Kimbrough was the first explicit acknowledgement by the Supreme Court that, in some areas, Congress has impeded the Sentencing Commission's mandate to construct fair and just Guidelines. The defense submits that it has certainly done so in child pornography cases. Mr. Van Aalsburg respectfully requests that this Court view the Sentencing Guidelines in this case with the same skepticism as did the district court in

16

*Kimbraugh*, as the same deficiencies exist in the Guidelines' treatment of child pornography cases as the court highlighted with respect to crack-cocaine cases.

IV.    *United States v. Williams* and *Ashcroft v. Free Speech Coalition*

An additional factor that this Court should consider in fashioning an appropriate sentence in this case, together with a heightened scrutiny of the Guidelines, is the Supreme Court's recent decisions, *United States v. Williams*, 128 S.Ct. 1830 (2008) and *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002).  The primary issue in *Williams* was a First Amendment challenge to certain provisions of the PROTECT Act, which Congress passed in 2003.  In addressing this issue, the Court tracked the twenty-five years of Congressional attempts to prohibit the dissemination of child pornography.  It acknowledged that "[t]he broad authority to proscribe child pornography is not, however, unlimited," noting that, in *Free Speech Coalition*, it had previously invalidated two provisions of the Child Pornography Protection Act of 1996 (CPPA), a precursor to the PROTECT Act, because they were overbroad.  *Id.* at 1836.  The Court struck the provisions because they involved Congress's attempt to criminalize distribution and pandering of material that appeared to be but was not necessarily child pornography, such as virtual pornography, because it did not depict actual children engaged in sexually explicit acts.  *Ibid.*

Following the Court's decision in *Free Speech Coalition*, Congress passed the PROTECT Act, the language of which the Supreme Court in *Williams* held "indicate[d] that Congress was still concerned that limiting the child-pornography prohibition to material that could be *proved* to feature actual children, as our decision in *Free Speech Coalition* required, would enable many child pornographers to evade conviction."  *Id.* at

17

1837.  Specifically, the Court cited Congressional findings that "[t]he emergence of new technology and the repeated retransmission of picture files over the Internet could make it nearly impossible to prove that a particular image was produced using real children . . . ." *Ibid.*

In the Court's acknowledgment in *Williams* of Congressional attempts to overreach, it several times reinforced its prior ruling in *Free Speech Coalition*, in which it held that the injury targeted by child pornography statutes is, narrowly, the sexual abuse of actual children: "as a permanent record of the child's abuse, the continued circulation itself would harm the child who had participated.  Like a defamatory statement, each new publication of the speech would cause new injury to the child's reputation and emotional well-being."  *Free Speech Coalition*, 535 U.S. at 249.  In other words, the Court, in carving an exception to the First Amendment, has now on multiple occasions limited the purpose of child pornography statutes to addressing continued harm to the child directly affected, rather than expanding the statutes' reach and purpose, as the government urged in *Free Speech Coalition*, to eliminating the market for child pornography or prohibiting morally objectionable conduct.  *See id.* at 251-52; *Williams*, 128 S.Ct. at 1844.

As *Free Speech Coalition* held and *Williams* has reaffirmed, child pornography under federal law does not include material that depicts "youthful-adult actors or virtual images of children generated by a computer."  *Williams*, 128 S.Ct. at 1836.  Accordingly, in considering an appropriate punishment for Mr. Van Aalsburg, this Court should follow the direction of the Supreme Court in those two cases and reject any consideration of whether Mr. Van Aalsburg's possession of child pornography is "indecent" or immoral, which are "wholly subjective judgments without statutory definitions, narrowing context, or

18

settled legal meanings." *Id.* at 1846.  Rather, in fashioning a fair and just sentence for

Mr. Van Aalsburg, this Court must focus on the harm that the Supreme Court has ruled is

the only actual and permissible target of the PROTECT Act and its precursors, despite

Congressional intent to the contrary: harm to the child.  In other words, what harm to any

actual children depicted in the images on Mr. Van Aalsburg's computers was caused by

Mr. Van Aalsburg's possession of the particular images?  The defense submits that this is

the appropriate consideration for this Court in determining, pursuant to § 3553(a), an

appropriate sentence for Mr. Van Aalsburg.

V.     Guidelines Calculations

Mr. Van Aalsburg agrees that the base offense level for a violation of 18 U.S.C. §

2252(a)(4)(B) is 18.

The 2-level increase pursuant to § 2G2.2(b)(2) for possession of material involving

a prepubescent minor is not applicable because there is no evidence that any image that

purportedly depicts a prepubescent minor is child pornography under the applicable

federal statutes.  In other words, there is no evidence that the particular images that

would form the basis of this increase depict actual children.  Further, there is no evidence

that Mr. Van Aalsburg actually possessed any such images.  In other words, there is no

evidence that Mr. Van Aalsburg could have, with reasonable effort, created a visual

image from a file containing such material at the time that the computers were seized.

*See United States v. Romm*, 455 F.3d 990, 998-99 (9th Cir. 2006).  Further, Mr. Van

Aalsburg has not admitted any conduct that would form the basis of this increase, as

counsel made it clear during the change of plea hearing that Mr. Van Aalsburg was not

admitting possession of the 600 images and the kind of images the government proffered

1    were included therein because such admissions were unnecessary to constitute the

2    offense under Count 1 of the information.  Exhibit A at 15.

3         The 5-level increase pursuant to § 2G2.2(b)(3) for distribution for a thing of value,

4    but not for pecuniary gain, is not appropriate.  There is no evidence that any image that

5    Mr. Van Aalsburg distributed for any purpose was child pornography.  In other words,

6    there is no evidence that any image that Mr. Van Aalsburg sent to AOL subscribers

7    contained depictions of actual children engaged in sexually explicit conduct, rather than,

8    for instance, virtual images created by a computer.  *See Free Speech Coalition*, 535 U.S.

9    at 250.  Accordingly, no increase pursuant to § 2G2.2(b)(3) is applicable in this case

10   unless and until the government proves by a preponderance of evidence that such an

11   increase is appropriate.

12        The 4-level increase pursuant to § 2G2.2(b)(4) for material that displays sadistic or

13   masochistic conduct is inappropriate because there is no evidence that any image that

14   may form the basis of this increase is in fact child pornography, in that it displays an

15   actual child engaging in sexually explicit conduct.  Again, Mr. Van Aalsburg did not admit

16   possessing any images that would form the basis of this increase during his change of

17   plea hearing.

18        Mr. Van Aalsburg acknowledges that a 2-level increase pursuant to § 2G2.2(b)(6)

19   for the use of a computer is appropriate.

20        The 5-level increase pursuant to § 2G2.2(b)(7)(D) for possessing more than 600

21   images is not appropriate because there is no evidence that Mr. Van Aalsburg possessed

22   that many images of proscribed child pornography.  Again, there is no evidence regarding

23   which and how many images depict actual children engaged in sexually explicit conduct,

24

25

26

27

28

20

1    and further there is no evidence regarding how many images that do depict actual,

2    proscribed child pornography were in Mr. Van Aalsburg's possession when his computers

3    were seized.  *See Romm*, 455 F.3d at 998-99.

4        The 2-level increase pursuant to § 3A1.1(b) for a vulnerable victim is inappropriate

5    absent further proceedings because there is no evidence that any image that could form

6    the basis of this increase depicts an actual child engaging in sexually explicit conduct,

7    rather than, for example, a virtual image created by a computer.

8        Both the government in its sentencing memorandum and the Probation Office in its

9    Presentence Investigation Report state that Mr. Van Aalsburg, due to his objections to

10    the Proposed Presentence Report, is not entitled to a reduction for acceptance of

11    responsibility.  Mr. Van Aalsburg accepted responsibility for both charges in the

12    information at the change of plea hearing.  It is true that he did not then and does not now

13    accept responsibility for any enhancement under the Sentencing Guidelines that has not

14    been proved by a preponderance of the evidence.   Nevertheless, the government

15    acknowledged during the change of plea hearing that any issue relating to such an

16    increase or enhancement is "a sentencing issue, and I don't think the defendant needs to

17    admit to that in order to proceed with the guilty plea today."  Exhibit A at 15.  Mr. Van

18    Aalsburg should receive the benefit of accepting responsibility for each charge of which

19    he is accused.

20        The defense submits that, for the foregoing reasons, Mr. Van Aalsburg's adjusted

21    offense level is 17: The base offense level is 18, with a 2-level increase for use of a

22    computer and a 3-level increase for early acceptance of responsibility.  Mr. Van Aalsburg

23    agrees with the Presentence Investigation Report's determination that he has zero

21

criminal history points and thus falls in Criminal History Category I.  The resulting

Sentencing Guidelines range is 24-30 months imprisonment.

VI.    18 U.S.C. § 3553(a)

In light of *Gall*, this Court should consult the Sentencing Guidelines in considering

a fair and just sentence for Mr. Van Aalsburg, but it should be guided primarily by the

factors enumerated in 18 U.S.C. § 3553(a).  In light of *Kimbrough*, and the lack of

empirical or reasoned basis for the Guidelines as they relate to child pornography, the

Court should view the Guidelines calculation, in this case 24-30 months, with skepticism.

Pursuant to § 3553, this Court must fashion a sentence that is sufficient but not greater

than necessary to comply with the statute.

Under § 3553(a)(1), this Court should take into consideration Mr. Van Aalsburg's

history and character as well as the nature and circumstances of the offense.  The

defense submits that Mr. Van Aalsburg has led a law-abiding, productive, and

constructive life for the past sixty years.  He is a business owner who provides a valuable

service to the community, and he has no criminal history whatsoever.  Although the

conduct giving rise to the offense occurred during a spasm of compulsive and obsessive

work focus, upon being confronted by law enforcement Mr. Van Aalsburg has committed

no further criminal act, including during several years before criminal charges were

brought against him.  According to Dr. Alfred Fricke, who evaluated Mr. Van Aalsburg in

connection with this case and whose report is attached as Exhibit B:

> Mr. Van Aalsburg has no priors, he has been married, he has no childhood
> conduct disorder, he was raised in an intact family, he is not psychopathic, he
> does not have problems with either general or sexual impulse control, he is not
> prone to use sex as a coping tool, he does not identify with children, he does not
> have a general lack of concern for others, he does not have lifestyle instability, he

does not show sexual deviancy, and he does not have one of the "malignant" personality disorders.

Exhibit B at 5. According to Dr. Fricke, "Mr. Van Aalsburg is seen as falling into the lowest possible risk category with respect to future criminal behavior of any kind and illegal sexual behavior in particular." *Ibid.*

Section 3553(a) also directs the Court to impose a sentence that reflects the seriousness of the offense and provides just punishment. The discussion in Section IV is relevant to this analysis. The defense urges the Court to reject any notion of punishing Mr. Van Aalsburg for the undeniably horrific nature of true child pornography generally; that is, the creation of images depicting terrible sexual abuse of real children. Mr. Van Aalsburg did not produce any image depicting actual children engaging in sexually explicit conduct, nor is there any allegation that he has ever acted inappropriately with a child. Pursuant to *Free Speech Coalition* and *Williams*, this Court should consider only the marginal harm that is inflicted upon any real child depicted in the images on Mr. Van Aalsburg's computer by his viewing of the image. It is that marginal added harm to the child's reputation and emotional well-being, *Free Speech Coalition*, 535 U.S. at 249, which flows from Mr. Van Aalsburg's viewing of the image, rather than subjective moral or ethical judgments concerning the child pornography industry or the terrible damage that it inflicts upon the vulnerable children it ensnares, that is properly before this Court in its determination of the seriousness of Mr. Van Aalsburg's offense.

As noted in Dr. Fricke's report, Mr. Van Aalsburg now understands that real children were victimized in the making of some images on his computer, and he regrets his actions. Several years ago he ceased them, he has not revisited them, and according to Dr. Fricke there is little concern that he will. The defense submits that, pursuant to §

23

3553(a), a reasonable, just, and appropriate sentence for Mr. Van Aalsburg is one year and one day in prison. Although this sentence is below the range recommended by the Guidelines, the defense submits that this Court should view that range with skepticism for the reasons stated above.

VII.    Evidentiary Hearing

Defense counsel understands that, according to the Local Rules, any party desiring that an evidentiary hearing be conducted at the time of sentencing should request such a hearing seven days prior to the sentencing date. As alluded above, there are two fundamental issues with this particular rule as it relates to this case:

(1)    Are the images that may form the basis of any increase from the base offense level real or virtual? Who makes that determination? These are important questions because, given the Supreme Court's rulings in *Williams* and *Free Speech Coalition*, possession of virtual child pornography is protected speech under the First Amendment, and thus should not be considered as relevant conduct for purposes of sentencing.

(2)    Did Mr. Van Aalsburg possess those particular images that do depict actual children engaged in sexually explicit conduct?

With respect to the second issue, the defense requested the following information in its objections to the Proposed Presentence Report: (1) Who provided the information regarding which particular images depicted actual children? (2) What efforts were made to find, create, or locate the particular images that do depict actual children? (3) Would a person with reasonable skill and knowledge have the capability to retrieve, locate, or

24

1   create these particular images?  None of this information is known to the defense, and it

2   did not receive any response to these inquiries.

3          With respect to the two issues listed above, the defense believes that the burden

4   is on the government to prove by a preponderance of the evidence that the increases and

5   enhancements under the Guidelines are appropriate.  If the Court agrees with this

6   proposition, the defense has no burden to produce evidence and thus believes that it

7   does not carry the burden to request an evidentiary hearing.  Notably, the Probation

8   Office states as follows in the addendum to its Presentence Investigation Report:

9

10              The USPO relied on evidence in the discovery provided by the U.S. Attorney's
               Office and the case agent.  The USPO is not in a position to determine the
11              number and type of child pornography images in question.  The USPO believes
               that this assessment and finding can be solely ascertained through expert
12              witnesses.  Absent a stipulation between the parties, the Court may wish to hold
               an evidentiary hearing to determine the number and type of child pornography
13              images found on the defendant's computers.

14   If the Court determines that the defense does have a burden to refute the statements

15   contained in the PSI that form the basis of the Guidelines calculations, Mr. Van Aalsburg,

16   by this memorandum, makes such a request.

17

18          VIII.    Request for Self-Surrender

19          The defense is aware that Pretrial Services recently notified this Court that,

20   pursuant to 18 U.S.C. § 3145(c), it may be required to remand Mr. Van Aalsburg absent a

21   showing of "exceptional reasons" why detention is not appropriate.  Mr. Van Aalsburg

22   respectfully requests that the Court allow him to self-surrender.

23
            Under § 3145(c), individuals convicted of certain offenses, including possession of
24
     child pornography, may remain out of custody pending the execution of a sentence if
25
     "there are exceptional circumstances why such person's detention would not be
26

27

28                                                                                         25

appropriate."  18 U.S.C. § 3145(c).  Congress has placed "broad discretion in the district court to consider all the particular circumstances of the case before it and draw upon its broad experience with the mainsprings of human conduct in determining whether release is appropriate."  *United States v. Garcia*, 340 F.3d 1013, 1018 (9th Cir. 2003) (internal quotations omitted).  "Exceptional reasons" under § 3145 may include whether "the defendant's criminal conduct was aberrational," "the defendant led an exemplary life prior to his offense and would be likely to contribute to society significantly if allowed to remain free on bail," or the offense involved a threat or injury.  *Id.* at 1019.  The Court may also consider "whether because of particular circumstances the defendant is exceptionally likely to flee or to constitute a danger to the community if he is permitted to remain free."  *Id.* at 1021 (emphasis in original).

Here, exceptional circumstances warrant this Court, in its discretion, to permit Mr. Van Aalsburg to self-surrender.  The conduct giving rise to this case was an aberration in an otherwise law-abiding, peaceful, and constructive life that Mr. Van Aalsburg has led for the past sixty years.  Mr. Van Aalsburg is a business owner whose devotion to his work and the community, of which he has been a member for thirty years, stands as a testament to his character.  He is under the supervision of Pretrial Services and is released on bail, and has been in complete compliance with the conditions of both.  He has made every court date.  He owns a home and a business.  In addition, Mr. Van Aalsburg does not own a car.  He does not present a flight risk.

Further, Mr. Van Aalsburg is not a danger to anybody, including himself.  He has not engaged in any criminal behavior in three and a half years, which includes more than two years from the date that the search warrant was executed to the date that the United

States Attorney's Office filed criminal charges against him.  There has never been an allegation that Mr. Van Aalsburg has had any inappropriate contact with minors, or that he has made any direct or indirect threats to anyone.  According to Dr. Fricke, "Mr. Van Aalsburg is seen as falling into the lowest possible risk category with respect to future criminal behavior of any kind and illegal sexual behavior in particular.  This makes common sense given his profile and track record to date (no criminal behavior, no obsessive or compulsive deviant sexuality) as well as from a formal risk assessment point of view."  Exhibit B at 5.

This issue arose at the time that Mr. Van Aalsburg changed his plea.  At that time, the government requested that the Court remand Mr. Van Aalsburg, and the Court denied the request.  There has been no change in circumstances since that time that would necessitate the Court to render a different determination on the issue now.  In addition, given *Gall*, *Williams*, and the additional authorities cited in this memorandum, the defense believes that the issues raised herein are novel, and an appeal of Mr. Van Aalsburg's sentence is likely.

Based upon the foregoing facts, Mr. Van Aalsburg requests that this Court permit him to self-surrender on any date that it deems appropriate.

IX.    Conclusion

For the foregoing reasons, Mr. Van Aalsburg, through his attorneys, respectfully requests that this Court impose a prison sentence of one year and one day, and impose a fine that it deems appropriate.

Dated: September 15, 2008

_____/S/_____
Thomas J. Nolan

—